# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

```
MARK CAIN, et al.,              )
                                )
            Plaintiffs,         )
                                )
     v.                         )       1:21cv81
                                )
THE TOWN OF YADKINVILLE,        )
                                )
            Defendant.          )
```

## MEMORANDUM OPINION AND ORDER

This case comes before the Court on "Defendant Town of Yadkinville's Motion to Amend Answer to Plaintiffs' Amended Complaint" (Docket Entry 20) (the "Motion"). For the reasons that follow, the Court will deny the Motion.

## BACKGROUND

In November 2020, Mark Cain, Jeffery Hobson, Hugh McKnight, and Ryan Preslar (collectively, the "Plaintiffs") filed suit against The Town of Yadkinville (the "Defendant") in North Carolina state court. (See Docket Entry 1 at 1-2.)[1] On January 28, 2021, Defendant removed the lawsuit to this Court (see id. at 1-4), and two weeks later, Plaintiffs filed an "Amended Complaint" (Docket Entry 9). As with Plaintiff's original complaint (see, e.g., Docket Entry 4, ¶¶ 11-28), the Amended Complaint alleges that Defendant, inter alia, failed to properly award benefits under a

---

[1] A fifth plaintiff, Timothy Jones, subsequently dismissed his claims against Defendant. (See Docket Entry 25 at 1.) [Docket Entry page citations utilize the CM/ECF footer's pagination.]

personnel policy in effect from approximately 2004 until the later part of 2018, and engaged in certain other "unlawful practices for several years" (Docket Entry 9, ¶ 90) prior to July 2018 (see, e.g., id., ¶¶ 10-112). On March 29, 2021, Defendant filed "Defendant's Answer to Plaintiffs' Amended Complaint" (Docket Entry 11 (the "Answer") at 1), raising five affirmative defenses (see id. at 22-23). However, Defendant did not include a statute of limitations defense in its Answer. (See id.)

Thereafter, the parties jointly proposed a deadline of June 11, 2021, to request leave to amend the pleadings. (See Docket Entry 13 at 3; Docket Entry 15 at 3.) The Court adopted the parties' proposal, entering a scheduling order that established the parties' deadline to request leave to amend their pleadings as June 11, 2021. (See Text Order dated May 22, 2021 (the "Scheduling Order").) Neither party moved to amend the pleadings by that deadline. (See Docket Entries dated May 18, 2021, to June 14, 2021.)

Four months after that deadline, on October 11, 2021 (see Docket Entry 20 at 4), Defendant moved, "pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure" (the "Rules"), "for leave of Court to amend its original Answer to Plaintiffs' Amended Complaint previously filed on March 29, 2021" (id. at 1). Specifically, Defendant seeks "leave to amend its answer to include an affirmative defense for the Statute of Limitations." (Id., ¶ 7;

2

see also Docket Entry 20-4 at 24 (adding as a "Sixth Further Defense" in proposed amended answer that "Defendant pleads the applicable Statute of Limitations in bar of some or all claims of Plaintiffs" (emphasis and all-cap font omitted).)[2] Plaintiffs oppose the Motion, arguing that Defendant has not established good cause under Rule 16(b) and that Defendant's requested amendment "would be futile" (Docket Entry 28 at 8) in light of the continuing wrong doctrine. (Id. at 5-11.) Defendant filed a reply to Plaintiffs' opposition, quoting Rule 15(a)(2) without mentioning Rule 16(b), but arguing that "[t]here has been no undue delay in this matter" (Docket Entry 30, ¶ 2) and that "[g]ood cause exists to grant the Motion" (id., ¶ 6). (See id., ¶¶ 1-6.) Defendant's reply did not address Plaintiffs' futility argument. (See id.)

## DISCUSSION

As the United States Court of Appeals for the Fourth Circuit has explained, "tension" exists between Rule 15(a), which "provides that leave to amend shall be freely given when justice so requires," and Rule 16(b), which "provides that a schedule shall not be modified except upon a showing of good cause and by leave of the district judge." Nourison Rug Corp. v. Parvizian, 535 F.3d 295, 298 (4th Cir. 2008) (internal quotation marks omitted). However, "[g]iven their heavy case loads, district courts require

---

[2] Defendant focuses its proposed statute of limitations defense on Plaintiffs' "breach of contract and [Fair Labor Standards Act] claims" (Docket Entry 20, ¶ 11). (See id., ¶ 12.)

3

the effective case management tools provided by Rule 16. Therefore, after the deadlines provided by a scheduling order have passed, the good cause standard must be satisfied to justify leave to amend the pleadings." Id.; see also Cook v. Howard, 484 F. App'x 805, 814-15 (4th Cir. 2012) (explaining that, after scheduling order deadline, "a party must first demonstrate 'good cause' [under Rule 16(b)(4)] to modify the scheduling order deadlines, before also satisfying the Rule 15(a)(2) standard for amendment"). "'Good cause' requires 'the party seeking relief [to] show that the deadlines cannot reasonably be met despite the party's diligence,' and whatever other factors are also considered, 'the good-cause standard will not be satisfied if the [district] court concludes that the party seeking relief (or that party's attorney) has not acted diligently in compliance with the schedule.'" Cook, 484 F. App'x at 815 (brackets in original).

Accordingly, "in considering whether 'good cause' excuses compliance with a scheduling order deadline, the district court *must* examine whether the movant had been diligent, though unsuccessful, in attempting to acquire the information that would have formed the basis of a timely motion to amend." Id. at 818-19 (emphasis in original). "If that party was not diligent, the inquiry should end." Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 609 (9th Cir. 1992) (explaining that, "[a]lthough the existence or degree of prejudice to the party opposing the

4

modification might supply additional reasons to deny a motion, the focus of the inquiry is upon the moving party's reasons for seeking modification"). Moreover, if a party knew or should have known of the basis for the proposed amendment prior to the scheduling order deadline, "then the party cannot establish good cause under Rule 16," Faulconer v. Centra Health, Inc., 808 F. App'x 148, 152 (4th Cir. 2020). See, e.g., Cummins, Inc. v. New York Life Ins., No. 10 Civ. 9252, 2012 WL 3870308, at *3 (S.D.N.Y. Sept. 6, 2012) ("The focus of the good cause inquiry is on the diligence of the party seeking to amend, and the court may deny leave to amend where the party seeking it knew or should have known the facts sought to be added to the [pleading]."); Interstate Narrow Fabrics, Inc. v. Century USA, Inc., 218 F.R.D. 455, 460 (M.D.N.C. 2003) ("'Good cause' under Rule 16(b) exists when evidence supporting the proposed amendment would not have been discovered 'in the exercise of reasonable diligence' until after the amendment deadline had passed. Good cause is not shown when the amendment could have been timely made." (citation and final set of internal quotation marks omitted)); see also Cook, 484 F. App'x at 817 ("The lack of diligence that precludes a finding of good cause is not limited to a [party] who has full knowledge of the information with which it seeks to amend its [pleading] before the deadline passes. That lack of diligence can include a [party's] failure to seek the

5

information it needs to determine whether an amendment is in order." (internal quotation marks omitted)).

Notably, even after Plaintiffs explicitly argued against granting the Motion under Rule 16(b) (see Docket Entry 28 at 5-8), Defendant offered no information regarding its attempts to comply with the Scheduling Order (see Docket Entries 20, 30). Instead, Defendant argued in its reply that "[g]ood cause exists to grant the Motion" because "Plaintiffs first claimed damages outside of the Statute of Limitations in their depositions of September 23rd and 24th, 2021; and" Defendant "moved to amend its Answer . . . within seven (7) days of receiving the deposition transcripts and has not previously moved this Court for an [a]mendment." (Docket Entry 30, ¶ 6.) Thus, Defendant failed to establish good cause under Rule 16(b). See Faulconer, 808 F. App'x at 153 (upholding determination that party failed to satisfy Rule 16(b) good cause standard where, inter alia, party moved to amend pleading "more than eight months after the scheduling order's deadline" and "[a]t no point has [the moving party] offered any explanation for that delay"); see also Premier Comp Sols., LLC v. UPMC, 970 F.3d 316, 319 (3d Cir. 2020) ("[T]he [district c]ourt did not abuse its discretion in ignoring [the plaintiff's] attempt to address Rule 16(b)(4)'s 'good cause' standard. In its motion, [the plaintiff] relied solely on Rule 15(a); it did not address Rule 16(b)(4) except in reply to [the defendant]. So the [d]istrict [c]ourt was

6

entitled to find [the plaintiff] forfeited its argument under Rule 16(b)(4).").

In addition, as Plaintiffs contend (see Docket Entry 28 at 5-7), the record demonstrates that Defendant should have known of its asserted statute of limitations defense prior to expiration of the Scheduling Order deadline.  The Amended Complaint provides ample notice that Plaintiffs seek damages for conduct occurring outside the statute of limitations period for breach of contract and Fair Labor Standards Act (the "FLSA") claims.  North Carolina applies a three-year statute of limitations for breach of contract claims generally, see N.C. Gen. Stat. § 1-52(1), reduced to two years for breach of contract claims against "a local unit of government," N.C. Gen. Stat. § 1-53(1), and the FLSA generally imposes a two-year statute of limitations, with a three-year statute of limitations applicable to willful violations, see 29 U.S.C. § 255(a).  Plaintiffs initiated this lawsuit in November 2020.  (See Docket Entry 4 at 1.)  Accordingly, unless an exception were to apply, the statute of limitations would limit Plaintiffs' breach of contract and FLSA claims to actions occurring either on or after November 2017 or on or after November 2018.

The Amended Complaint makes clear, however, that Plaintiffs seek relief for actions dating back as early as 2004 and, at a minimum, for many years prior to November 2018.  In this regard, the Amended Complaint alleges, inter alia:

7

Hobson and Cain entered into employment contracts with Defendant in 1999 and 2003, respectively, while Preslar and McKnight entered into such contracts in 2014 and 2017, respectively. (See Docket Entry 9, ¶¶ 5-7, 9.)[3] "When Plaintiffs began working for [Defendant], they were informed that in addition to earning a certain annual salary, they would receive vacation days, sick leave, and other benefits provided to employees of the Town. It was understood that the benefits were part of the compensation provided to [Defendant's] employees and were earned each year." (Id., ¶ 10.) "On or about 2004, [Defendant] implemented its *Personnel Policy Manual* (the "*Policy Manual*"), promising its employees certain benefits in consideration of work performed for [Defendant]." (Id., ¶ 11.) The *Policy Manual* detailed holiday pay calculations as well as vacation and sick day accruals. (Id., ¶¶ 13-16.) "At the time the *Policy Manual* was adopted by [Defendant] and throughout the years that followed, most police officers for [Defendant] had twelve-hour workdays." (Id., ¶ 17.) Cain, McKnight, and Preslar all worked twelve-hour days, but from 2011 to 2019, Hobson worked 8.5-hour days. (See id., ¶¶ 31-32.) "Around the time the *Policy Manual* was implemented, [Defendant] held a meeting with public employees and the former Town Manager, Ken Larkin (the 'Former Town Manager'), to discuss

---

[3] Plaintiffs all serve or served as police officers for Defendant. (See id.)

8

its provisions. Officers [who] were present during this meeting were provided copies of the *Policy Manual*." (Id., ¶ 12.) At that meeting, officers, including Cain, asked questions regarding the accrual of their benefits and the Former Town Manager represented to them "that the benefits promised in the *Policy Manual* would be provided to them 'day for day'" (id., ¶ 21) rather than "based on the shorter, eight-hour day worked by most employees of [Defendant]" (id., ¶ 22). (See id., ¶¶ 18-20.)

"In reliance on these public, oral representations regarding the benefits they would earn by virtue of their employment, the officers who were working for [Defendant] during the implementation of the *Policy Manual* were induced to continue working for [Defendant]." (Id., ¶ 23.)[4] "As a result, these representations created supplementary contracts with these officers based on the mutual agreement to these terms expressed by [Defendants] and the officers (the 'Supplemental Contracts')." (Id., ¶ 153.)[5] "From 2004 onward, there was a common understanding among police officers that they would earn benefits 'day for day' based on the Former Town Manager's public statement during the Town meeting." (Id., ¶ 24.) "Moreover, other benefits guaranteed in the Policy Manual,"

---

4  This includes Cain and Hobson. (See id., ¶¶ 5, 7.)

5  "In addition, Plaintiffs' contracts of employment with [Defendant] also entitled them to the payment of benefits earned based on the length of their workday under the *Policy Manual* (the 'Contracts')." (Id., ¶ 157.)

9

such as funeral leave (see id., ¶¶ 26-28), "were provided based on the length of the employee's actual workday." (Id., ¶ 25.) "In practice, [Defendant] also has an established practice of interpreting most officers' workdays to require twelve hours of work, rather than eight. This means that when most officers take a day off from work, they must use twelve hours of personal time." (Id., ¶ 29.)

Around July 2018, Preslar challenged his lack of opportunity to accrue compensatory time, which he believed contravened the *Policy Manual*. (See id., ¶¶ 33-35.) Preslar obtained a copy of the *Policy Manual* and, upon reviewing it, discovered that Defendant "was also violating its policies regarding how employees earn and accrue benefits." (Id., ¶ 36.) Specifically, "Preslar realized that, contrary to the plain meaning of the *Policy Manual* and the common understanding among the officers, he only received eight hours of vacation or sick time per 'day' rather than twelve." (Id., ¶ 37.) "To address this issue, Mr. Preslar met with [Defendant's] Finance Manager, Dina Reavis, (the 'Finance Manager'). Mr. Preslar informed her that [Defendant] was not following its own *Policy Manual* because it was not providing him benefits based on the length of his actual workday." (Id., ¶ 38.) "After speaking with Mr. Preslar and discussing the language of the *Policy Manual*, the Finance Manager agreed that 'you're right'.

10

However, she stated that she had been providing the officers with benefits in the manner that she had been instructed." (Id., ¶ 39.)

At the Finance Manager's suggestion, Preslar spoke with the then-current Town Manager. (See id., ¶¶ 40, 43-52.) At that meeting, Preslar informed the Town Manager that he was "not getting paid for 12 hours" (id., ¶ 46 (internal quotation marks omitted); see id., ¶ 47) even though he worked 12-hour days (see id., ¶ 45), news that appeared to surprise the Town Manager (id., ¶ 48). "So, [the Town Manager] called the Finance Manager into the meeting and asked, 'is he not getting paid what he's supposed to get paid?'" (Id.) "The Finance Manager responded, 'he's getting paid for 8 hours, which is what I was taught.'" (Id., ¶ 49.) "After hearing this, the Town Manager told Mr. Preslar, 'I see what you're talking about.'" (Id., ¶ 51.) The Town Manager promised to "get back to" Preslar. (Id., ¶ 52 (internal quotation marks omitted).)

Defendant's officials subsequently informed officers "that the policy was intended to be based on an eight-hour day" (id., ¶ 62), a fact the officers disputed (see id., ¶ 63). "On or about August 6, 2018, the Town Board met to discuss the officers' concerns that they were not accruing benefits and vacation time based on a twelve-hour day, despite the plain meaning of the *Personnel Policy* and the statements made by the Former Town Manager." (Id., ¶ 69.) At that meeting, the Town "Board voted to implement a revised policy manual (the '*2018 Personnel Policy*') which stated that

11

benefits would be earned in terms of hours rather than days" (id., ¶ 73) and "also reviewed a Pay Study which addressed concerns that some of [Defendant's] employment practices had been unlawful" (id., ¶ 74). The police department held a mandatory staff meeting on November 27, 2018, which the Town Manager attended "to discuss the new Personnel Policy, Pay Study and Organizational Chart" (id., ¶ 77 (internal quotation marks omitted)). (See id., ¶ 78.) "During the meeting, the officers were informed that under the *2018 Personnel Policy*, they would earn sick time, vacation days, and holiday pay based on an eight-hour workday." (Id., ¶ 79.)

"On or about June 10, 2019, Plaintiffs, through counsel, provided [Defendant] with written notice that the retroactive application of the *2018 Personnel Policy* was depriving the officers of benefits they had already earned." (Id., ¶ 85.) In particular:

> Plaintiffs' attorney informed [Defendant's] attorney Ben Harding that, "[a]lthough the *Policy Manual* was rewritten in December 2018, these issues remain unresolved for my client[s]. The interpretation provided by [Defendant] is unreasonable given the clear language of the policy when [the officers were] hired. [Defendant] cannot unilaterally deny [the officers] the benefits to which [they are] entitled. Although a policy can certainly be changed with proper notice and procedure, [Defendant] is still responsible for the harm that has been done by failing to follow its previous policy. Please accept this letter as a formal demand for a written accounting and repayment of all employee benefits and leave time that has been taken from [the officers]."

(Id., ¶ 86 (certain brackets in original).) Thereafter,

> [o]n or about August 20, 2020, Plaintiffs' attorney emailed [Defendant's] attorney and asked about "the dispute regarding [Defendant's] benefits policies

> (holiday pay, sick time, vacation time) — what's [Defendant's] final response to the officers' request for the loss in benefits/leave experienced because the policies weren't applied in a way that accounted for the fact that the officers work 12-hour days, rather than 8?"

(Id., ¶ 122.) "On or about August 28, 2020, [Defendant's] attorney, William Hill, provided [Defendant's] final response that its employees were only compensated based on an eight-hour day." (Id., ¶ 123.)[6]

The officers have not "received repayment of the benefits and leave time that had been taken from them due to [Defendant's] failure to follow its own *Personnel Policy*." (Id., ¶ 89.) "[Defendant's] refusal to compensate Plaintiffs for benefits already earned after it was notified of its failure to follow its *Policy Manual* on June 10, 2019 has proximately caused Plaintiffs to be deprived of benefits already earned." (Id., ¶ 145.) Likewise, the Town "Board's decision to retroactively apply the new provisions from the *2018 [Personnel Policy]* has deprived Plaintiffs of benefits earned under the terms of the *Policy Manual*." (Id., ¶ 146.) Defendant's actions "have breached the Contracts and/or the Supplemental Contracts by denying Plaintiffs benefits already earned during the effective period of the *Policy Manual*." (Id., ¶ 167.)

---

6 William Hill represents Defendant in this lawsuit. (See, e.g., Docket Entry 3 at 1.)

In addition, officers "expressed their concern that [Defendant] had been engaging in certain, unlawful practices for several years." (Id., ¶ 90.) Defendant ceased some of these challenged practices in or around July 2018 (see id., ¶¶ 96-112), June 2019 (see id., ¶¶ 94-95), and June 2020 (see id., ¶¶ 91-93). Certain of the practices that ceased in July 2018 had occurred "[f]or several years" prior to their cessation. (Id., ¶¶ 96, 111.) Defendant "has not adequately compensated officers for all time worked, including time [connected to these challenged practices] prior to the changes to its practices." (Id., ¶ 126.) Also, "[Defendant] has wrongfully withheld contributions to the officers' retirement accounts due to one or more of these actions." (Id., ¶ 127.)

These allegations make clear that Plaintiffs seek damages for actions occurring (long) before November 2017 and November 2018. Thus, at the latest, the filing of the Amended Complaint placed Defendant on notice of its potential statute of limitations defense. Defendant could have included its proposed statute of limitations defense in its Answer to the Amended Complaint or, at a minimum, investigated the grounds for such defense prior to the Scheduling Order's deadline for requesting leave to amend the pleadings. Defendant's lack of diligence in pursuing this amendment warrants denial of the Motion. See, e.g., Faulconer, 808 F. App'x at 152-53; Cook, 484 F. App'x at 817; Great Lakes Ins. SE

14

v. Andersson, 338 F.R.D. 424, 427-28 (D. Mass. 2021) (denying motion to amend under Rule 16(b), noting that, although plaintiff "claims that it acted with the utmost diligence possible, considering that it only became aware of [the defendant's] likely breach of the Named Operator Warranty on June 4, 2021, the date of his deposition, and sought leave to amend one week after the transcript became available on June 21, 2021," the court "agree[d] with [the defendant] that [the plaintiff] had earlier notice of — or good reason to suspect the existence of — this cause of action"); see also McMillan v. Cumberland Cnty. Bd. of Educ., 734 F. App'x 836, 846 (4th Cir. 2018), as amended (Apr. 4, 2018) (finding that plaintiff "did not show good cause to amend her complaint," explaining that "[o]rdinary diligence would have revealed the fact that she could have asserted a breach of contract claim because the basis on which she would assert a breach of contract claim stems from the same allegations on which she asserted her other claims").

Moreover, "[e]ven assuming [that Defendant] had demonstrated good cause to modify the scheduling order, the Court would deny leave to amend the [Answer] under Rule 15(a)(2) because such amendment would be futile." Belcher v. W.C. Eng. Inc., 125 F. Supp. 3d 544, 550 (M.D.N.C. 2015). "Although Rule 15(a)(2) provides that '[t]he court should freely give leave when justice so requires,' futility of the amendment is one basis for denying such

15

leave." Id. (brackets in original). Here, Plaintiffs assert that the "continuing wrong" doctrine, which "allows plaintiffs to litigate matters that would otherwise be barred by the statute of limitations if they were part of an ongoing practice or pattern of behavior," applies to their claims. (Docket Entry 28 at 8.) Thus, Plaintiffs argue, "the statute of limitations does not bar any of [their] claims," rendering Defendant's proposed amendment "futile" and justifying denial of the Motion. (Id. at 11; see also id. at 8 ("Even though [Cain and Hobson] learned of some of [Defendant's] illegal activities . . . in 2004, these were part of a continuing wrong committed by Defendant against them. As such, the statute of limitations should be tolled and the additional affirmative defense sought by [Defendant] would therefore be pointless, except to unnecessarily complicate the case.").) Defendant did not respond to Plaintiffs' argument that the continuing wrong doctrine renders its proposed statute of limitations defense futile. (See Docket Entry 30, ¶¶ 1-6.) By failing to address Plaintiffs' argument, Defendant concedes this issue. See, e.g., Kinetic Concepts, Inc. v. Convatec Inc., No. 1:08cv918, 2010 WL 1667285, at *6-9 (M.D.N.C. Apr. 23, 2010) (examining implications of such failure, noting existence of "general principle that a party who fails to address an issue has conceded the issue," and collecting cases).

## CONCLUSION

Defendant failed to establish good cause for its untimely Motion and conceded the futility of its proposed amendment.

**IT IS THEREFORE ORDERED** that the Motion (Docket Entry 20) is **DENIED**.

This 29th day of April, 2022.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**